United States District Court
Southern District of Texas
**ENTERED**
December 31, 2021
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LAMAR CONSOLIDATED INDEPENDENT SCHOOL DISTRICT, | § § § § § § § § § § § § | CIVIL ACTION NO. 4:20-cv-02353 |
| Plaintiff, | | |
| vs. | | JUDGE CHARLES ESKRIDGE |
| J.T. b/n/f APRIL S., Defendant. | | |

**OPINION AND ORDER**
**GRANTING MOTION FOR PARTIAL SUMMARY JUDGMENT**

The Individuals with Disabilities in Education Act requires state school districts that receive federal funds to make available to children with qualifying disabilities a free, appropriate public education (known as a *FAPE*). See 20 USC § 1412(a)(1)(A). Each FAPE must be tailored to the needs of the individual student according to the design of an independent educational plan (known as an *IEP*) or behavioral intervention plan (known as a *BIP*). See 20 USC §§ 1414(d) & 1415(k).

This action stems from a complaint originally filed with the Texas Education Agency by April S. as next friend of her son, J.T., asserting that Lamar Consolidated Independent School District denied J.T. his FAPE during the Fall 2018 semester in violation of the IDEA. A TEA special education hearing officer found in favor of J.T.

Lamar CISD initiated this administrative appeal to challenge that ruling. It brought a motion for partial summary judgment to reverse and vacate the hearing officer's decision. Dkt 20. Specifically, Lamar CISD seeks a ruling to reverse the award of relief as contrary to the facts

and law, and to instead find that its remedial efforts were in compliance with the IDEA and ensured that J.T. received a FAPE—thus also finding that J.T. isn't a prevailing party entitled to an award of attorney fees.

For reasons stated here, the motion is granted.

1. Background

J.T. attends George Ranch High School, and April S. is his mother. George Ranch is part of Lamar CISD and is located in Fort Bend County, Texas, roughly ten miles southwest of Sugar Land. J.T. started at George Ranch in the Fall of 2018 upon transfer into Lamar CISD. AR 6; see also Dkt 1 at ¶ 4.1.

J.T. has various learning disabilities, including Rubenstein-Taybi syndrome. This causes him to experience limited strength, heightened alertness to stimuli, subaverage general intellectual functioning, deficits in adaptive behavior, impaired articulation, and mood changes (including temper outbursts and anxiety), among other symptoms. Due to his various disabilities, J.T. occasionally becomes very upset and reacts angrily, at times by yelling or throwing his belongings. Dkt 1 at ¶ 4.1. These outbursts are expected from him, and the appropriate instructive response is addressed in his designated BIP. For example, April S. was at times asked to pick J.T. up from school early, and J.T. at times needed to be restrained to prevent him from hurting himself or others. See AR 2242–45 (incidents on 09/04/2018 and 09/10/2018). Further, the Admissions, Review, and Dismissal Committee of Lamar CISD (referred to as the *ARD Committee*) met regularly to discuss these incidents and any changes needed to J.T.'s IEP or BIP. For example, see AR 2163–220 (09/21/2020 ARD Committee report); AR 2247–60 (10/26/2018 ARD Committee report).

The transition by J.T. to George Ranch for the Fall 2018 semester presented a number of challenges due to concerns like those noted above. Of import, the TEA hearing officer ultimately determined that J.T.'s claims in this action are limited by a one-year statute of limitations,

2

thus focusing the dispute on those claims arising on or after November 20, 2018. AR 5–6; see also Tex Admin Code § 89.1180(i) (one-year statute of limitations). But at an ARD meeting just prior to that on November 2nd, the ARD Committee reviewed a new function behavioral assessment (known as an *FBA*) and proposed new academic goals as requested by April S. See AR 2656 (deliberations), 2657–67 (goals). In addition to the new IEP goals, the ARD Committee also introduced a new BIP along with two new behavioral goals. AR 2673.

Much of this dispute concerns J.T.'s interactions with a former George Ranch teacher named Regina Thurston. She was new to George Ranch at the start of the Fall 2018 semester and resigned at its end. Dkt 1 at ¶ 4.2; AR 39. During that semester, she responded inappropriately to J.T.'s outbursts several times. Such instances after November 20th included:

- o *On November 29th,* in frustration with one of J.T.'s outbursts, Thurston forcefully grabbed him while he was on the ground and threw his shoes across the room;
- o *On December 14th,* while students waited to get on the bus, Thurston told J.T. "if you want to kick me then walk over here and kick me"—but after doing what he was told, Thurston kicked J.T. in the shin;
- o *On December 18th,* after J.T. had become upset in response to a loud video and turned over his desk, she dumped additional items on the floor and yelled at him to "pick it up";
- o *On December 19th,* after J.T. had become physically aggressive, Thurston grabbed him by the arm and shoved him to the ground, with another physical interaction causing them both to fall to the ground; and

> - *On December 20th,* again without any apparent provocation, Thurston pushed J.T. from a ball chair onto the floor.

AR 17–20.

Members of the George Ranch administration began investigating the December 14th incident promptly. But the school didn't inform April S. of that incident at an ARD Committee meeting on December 18th. AR 19. And it wasn't until December 20th that the school requested April S. to view video of the incident. AR 21, 3221–22. At that time, April S. also requested and was allowed to view video from the November 29th incident. She suspected that an incident had occurred that day because J.T. came home from school with scratches on his arm. AR 20.

At the beginning of the Spring 2019 semester, J.T. received a half-day suspension for an outburst. April S. requested a meeting with the ARD Committee, at which she requested that J.T. receive temporary homebound instruction. The ARD Committee agreed, and after several days of homebound instruction, April S. permitted J.T. to return to school. But on January 30th, the administration showed April S. the December 19th video as part of its continuing investigation into Thurston and monitoring of its special education policies. April S. then refused to permit J.T. to attend in-person instruction for the remainder of the 2018–2019 school year. AR 20–21.

George Ranch provided increased homebound services during this time. As explained in the administration decision:

> Homebound instruction was increased from 4 hours/week to 10 hours/week. The ARD committee agreed to provide occupational therapy, personal care services, and ABA therapy. It also agreed that adaptive PE would be provided and that compensatory speech therapy services would be made up before the end of the school year. . . . The district agreed to pay

4

> for six months of private counseling sessions for [J.T.] and [April S.]. [April S.] stopped attending following the May 15, 2019 session.

AR 21–22.

The ARD Committee met in August 2019 to review J.T.'s full individual evaluation (known as an *FIE*) and to discuss his education for the 2019–2020 academic year. The ARD Committee and April S. agreed to a plan to transition J.T. back to school by providing him a combination of on-campus and homebound instruction. AR 23. Even so, she filed an administrative complaint with the TEA asserting that Lamar CISD denied J.T. a FAPE in violation of the IDEA. Ibid; see also Dkt 1 at ¶ 4.7.

A special education hearing officer of the TEA eventually conducted a hearing and determined (among other things) that J.T. was denied a FAPE for the Fall 2018 semester. He ordered Lamar CISD to provide J.T. one semester of compensatory services and other miscellaneous benefits. The full decision can be found at AR 1–53.

Lamar CISD filed a complaint in July 2020 to appeal this administrative decision. Dkt 1. J.T. answered and asserted counterclaims for violations of the Americans with Disabilities Act, the Rehabilitation Act, and equal protection under the Fourteenth Amendment pursuant to 42 USC § 1983. See Dkts 10 & 12 at ¶¶ 164–206. Counsel confirmed at hearing that J.T. continues to attend George Ranch at present.

Lamar CISD moved for partial summary judgment to reverse and vacate aspects of the decision by the hearing officer as to the conclusion that it didn't comply with the IDEA and to request a finding instead that its remedial efforts ensured that J.T. received a FAPE. Dkt 20. That motion is addressed here. Lamar CISD also moved to dismiss the Section 1983 counterclaim by J.T. Dkt 15. That motion has been stayed pending determination here. Minute Entry of 10/21/2020.

2. Legal standard

J.T. at base complains about the substantive appropriateness of his IEP. For such a challenge, the Fifth Circuit directs district courts to follow the four-factor test set forth in *Cypress-Fairbanks ISD v Michael F.*, 118 F3d 245 (5th Cir 1997). These factors are:

- *First,* whether the program is individualized on the basis of the student's assessment and performance;
- *Second,* whether the program is administered in the least restrictive environment;
- *Third,* whether the services are provided in a coordinated and collaborative manner by the key stakeholders; and
- *Fourth,* whether positive academic and non-academic benefits are demonstrated.

*Michael F.*, 118 F3d at 253; see also *E.R. v Spring Branch ISD*, 909 F3d 754, 765 (5th Cir 2018).

Some litigants (including J.T. here) have argued that the pertinent law changed with the recent Supreme Court decision in *Endrew F. v Douglas County School District RE-1*, 137 S Ct 988 (2017); see Dkt 23 at 18–19. But the Fifth Circuit has since expressly addressed *Endrew F.* and determined that the *Michael F.* factors are consistent with that decision and continue to govern this type of IDEA claim. See *Amanda P. v Copperas Cove ISD*, 838 F App'x 104, 106 n 1 (5th Cir 2021).

With respect to the weight of each factor, the Fifth Circuit has said that district courts needn't apply them "in any particular way." *R.S. v Highland Park ISD*, 951 F3d 319, 330 (5th Cir 2020, *per curiam*), quoting *Richardson ISD v Michael Z.*, 580 F3d 286, 294 (5th Cir 2009) (quotation marks omitted). That is so because the factors are only *indicators* of an IEP's appropriateness. *Michael Z.*, 580 F3d at 294 (collecting cases). This means that a district court doesn't "legally err by affording more or less weight to particular *Michael F.* factors." Ibid. Still, the Fifth Circuit "has found that the fourth factor is 'one of the most

critical factors in this analysis.'" *P.P. v Northwest ISD*, 839 F App'x 848, 854 (5th Cir 2020, *per curiam*), quoting *Houston ISD v V.P.*, 582 F3d 576, 588 (5th Cir 2009).

In reviewing an administrative decision, a district court must give findings of the hearing officer "due weight." *Michael F.*, 118 F3d at 252, quoting *Board of Education of Hendrick Hudson Central School District v Rowley*, 458 US 176, 206 (1982) (quotation marks omitted). But "the court must ultimately reach an independent decision" based on its evaluation of the evidence. Ibid. As such, the standard of review is "virtually *de novo*." Ibid (quotation marks and citation omitted). And the party challenging the IEP bears the burden to show that the IEP and resulting placement was inappropriate. Ibid.

### 3. Analysis

The primary challenge brought by J.T. is to the *implementation* of his IEP. When that is so, the first two *Michael F.* factors are "generally not at issue." *Spring Branch ISD v O.W.*, 961 F3d 781, 796 (5th Cir 2020) (quotation marks and citation omitted). And indeed, counsel for J.T. confirmed at hearing that he doesn't challenge the first two factors. See Dkt 20 at 24–25 (noting no appeal by J.T. on these factors).

In this posture, a court must instead "decide whether a FAPE was denied by considering, under the third factor, whether there was a 'substantial or significant' failure to implement an IEP; and under the fourth factor, whether 'there have been demonstrable academic and non-academic benefits from the IEP.'" *O.W.*, 961 F3d at 796, quoting *Houston ISD v Bobby R.*, 200 F3d 341, 349 (5th Cir 2000).

#### a. Provision of educational services in a coordinated and collaborative manner

On this issue, the party "challenging the implementation of an IEP must show more than a *de minimis* failure to implement all elements of that IEP, and, instead, must demonstrate that the school board or other authorities failed to implement substantial or significant provisions of the IEP." *Bobby R.*, 200 F3d at 349. Whether

7

a provision is significant keys primarily to whether it confers an educational benefit. Id at 349 n 2.

The hearing officer noted that the evidence cuts both ways without expressly determining whether it weighed more heavily in favor of one party over the other. In favor of Lamar CISD, the hearing officer noted the clear dedication by the ARD Committee to implementing J.T.'s IEP—as evidenced by their meeting frequently to discuss the subject, J.T.'s substantial academic progress, and their accommodating him and April S. following the decision to temporarily withdraw J.T. from George Ranch. In favor of J.T., the hearing officer noted Thurston's failure to implement the IEP's guidance with respect to communication techniques and George Ranch's failure both to provide April S. with regular progress reports and to timely report the incidents involving Thurston and J.T. to April S. See generally AR 32–35.

Lamar CISD argues that this factor weighs in its favor, stressing that the failures of the Fall 2018 semester mustn't be viewed in a vacuum, but instead that its services given to J.T. must be viewed in their entirety. See generally Dkt 20 at 26. It highlights the hearing officer's finding that, in the Spring 2019 semester, its "prompt response [to the Fall 2018 semester] brought compliance with [J.T.'s] IEP to ensure [J.T.] received a FAPE after January 2019." Id at 26, quoting AR 40. And Lamar CISD argues that its efforts to accommodate April S. and remedy any damage show ample coordination and collaboration. Dkt 20 at 28–29.

J.T. raises two arguments in response—*first,* that Lamar CISD failed to collect and record meaningful data with respect to J.T.'s development and to deliver progress reports to April S.; and *second,* that Lamar CISD hid information related to J.T.'s education from April S., especially the incidents involving Thurston. See Dkt 23 at 16–17, 22–23.

The special hearing officer was undoubtedly correct that the evidence doesn't clearly favor either party. It certainly can't be denied that Thurston failed to follow the

behavioral intervention plans of the IEP, which resulted in further outbursts by J.T.—much less that she actually struck him. And it likewise can't be denied that Lamar CISD wasn't as promptly forthcoming with respect to the Thurston incidents as it could have been. These failures by Lamar CISD are serious.

Still, it must be recognized that Lamar CISD without question also took these failures seriously and promptly mitigated them with its subsequent actions. And even if arguably tardy, it did ultimately fully explain the Thurston incidents. It also made genuine efforts to accommodate April S. and maintain J.T.'s education when she held him out of school, including providing specialized instruction and offering other placement. Lamar CISD actively collaborated with April S. during this time, meeting many times to discuss accommodations and alternatives.

It's important to remember that the central purpose of implementing an IEP—and of coordinating and collaborating with key stakeholders in that respect—is to confer *educational benefits*. The Fifth Circuit has explained such focal point this way:

> While consideration of any educational benefit received might arguably seem to conflate the third and fourth prongs of the *Cypress-Fairbanks* inquiry, determination of what are "significant" provisions of an IEP cannot be made from an exclusively *ex ante* perspective. Thus, one factor to consider under an *ex post* analysis would be whether the IEP services that were provided actually conferred an educational benefit.

*Bobby R.*, 200 F3d at 349 n 2.

As explained in detail next, J.T. received meaningful academic and non-academic benefits during the Spring 2019 semester. And in this respect, analysis of the third factor shows that the failures identified above didn't ultimately detract from Lamar CISD fulfilling its

obligation to provide J.T. with a FAPE as measured over the whole of the 2018–2019 academic year.

### b. Positive academic and non-academic benefits

The Fifth Circuit has said that "educational benefit" is one of the most critical factors in assessing the appropriateness of an IEP. *V.P.*, 582 F3d at 588. Clearly, "evidence of an academic benefit militates in favor of a finding that an IEP is appropriate." *Klein ISD v Hovem*, 690 F3d 390, 399 (5th Cir 2012). "Whether a child is able to pass general education classes and whether a child's test scores have increased are important indicators of whether a child has received a meaningful benefit." *D.C. v Klein ISD*, 860 F App'x 894, 904 (5th Cir 2021); see also *Leigh Ann H. v Riesel Independent School District*, 18 F 4th 788, 798 n 12 (5th Cir 2021) (educational benefit found on basis of grade improvement and standardized test scores). The progress made must be more than minimal, and benefits conferred must be meaningful. See *V.P.*, 582 F3d at 588.

It's also important to contextualize these considerations with a student's particular circumstances. That is:

> A disabled child's development should be measured not by his relation to the rest of the class, but rather with respect to the individual student, as declining percentile scores do not necessarily represent a lack of educational benefit, but only a child's inability to maintain the same level of academic progress achieved by his non-disabled peers.

*Bobby R.*, 200 F3d at 349. "Whether advancement is so trivial or minor as to qualify as *de minimis* must be evaluated in light of the child's circumstances." *R.S.*, 951 F3d at 337.

This means that, even if the disabled child experiences brief periods of limited progress, or even regression, the IDEA hasn't necessarily been violated. Id at 336–37. Rather, the "ultimate legal issue" is whether, from a

holistic perspective, the child "was receiving a meaningful educational benefit from the services provided." *V.P.*, 582 F3d at 591. And the Fifth Circuit instructs courts to bear in mind that the IDEA doesn't require that schools establish "the best possible education or one that will maximize her potential," but rather that it set a "basic floor of opportunity." Id at 590, citing *Rowley*, 458 US at 188–89, 201 (quotation marks omitted).

A central issue addressed at hearing was the temporal scope of the analysis on this factor—that is, whether academic and non-academic benefits are to be weighed by considering only the events *during the Fall 2018 semester*, or by considering *the entire 2018–2019 academic year*. The hearing officer limited his analysis to the end of the Fall 2018 semester, and so he determined that this factor weighs in favor of J.T. On academic benefits, he found that Thurston's failure to implement J.T.'s IEP (especially with respect to communication techniques) denied him meaningful academic progress. With respect to non-academic benefits, he found that J.T. didn't develop any meaningful benefits, and that his behavioral problems may have even worsened during this time. See AR 35–37.

But statutory and regulatory provisions confirm than an IEP is intended to be implemented and measured with reference to a given academic year. For example, an IEP itself is usually developed for and pertains to an academic year as a whole, with the educational program recommended by the IEP designed to be implemented and monitored over the period of a full year. For example, see 20 USC § 1414(d)(1)(A)(i)(II) (IEP as "statement of measurable annual goals, including academic and functional goals"); 34 CFR § 300.320(a)(2) (same); see also 20 USC § 1414(d)(2)(A) (IEP to be in effect at "beginning of each school year"); 34 CFR § 300.323(a) (same). Indeed, the Supreme Court explains that a student's IEP sets out "*annual* goals designed to enable the child to be involved in and make progress in the general education curriculum." *Endrew F.*, 137 S Ct at 1000 (emphasis added). As such, academic and non-academic benefits must be weighed by

11

considering the entirety of a given academic year—here, the 2018–2019 academic year.

Lamar CISD thus points out that the hearing officer's analysis ignored steps taken and achievements gained in the Spring 2019 semester. And it argues that this factor instead weighs in its favor because J.T. received meaningful academic and non-academic benefits during the relevant time period of the 2018–2019 school year. See Dkt 20 at 29–32. Lamar CISD highlights the finding by the ARD Committee that J.T. mastered his IEP goals with respect to English, math, science, social studies, and behavior. See Dkt 20 at 31. He also demonstrated improvements on that year's STAAR tests. Id at 30. Lamar CISD also stresses the fact that April S. "never expressed any concerns or disagreement" with J.T.'s progress. Ibid. For instance, when asked about the adequacy of the homebound services teacher, April S. said that the teacher "has gone above and beyond to make sure that [J.T.] progresses." Ibid, quoting AR 3261.

J.T. maintains to the contrary that he was denied meaningful academic and non-academic benefits in the Fall 2018 semester. See Dkt 23 at 23–28. That is, the ARD Committee documented J.T. as having failed to make academic progress in that semester and as having numerous continuing behavioral issues. He also stresses the failures by Thurston, who was unable to instruct him with respect to both academic subjects and non-academic subjects like behavior. J.T. also argues that the presence of *some* educational progress doesn't necessarily mean that Lamar CISD has *fully* complied with the IDEA. For instance, J.T. contends that he might have made even more progress if Lamar CISD had properly and consistently implemented the IEP.

J.T.'s IEP was set to cover—and thus pertains to—an entire academic year. AR 2163. As noted above, that is the timeframe that must be considered. Any other conclusion would necessarily fail implementation of an IEP as a whole upon encountering discrete problems during implementation, for the very reason that some putative further benefit

to the student could have been gained if the problem hadn't occurred. But even if more progress was *possible*, more progress isn't *required*. The Fifth Circuit instead quite clearly states, "An IEP need not maximize a child's potential in order to comply with IDEA." *R.S.*, 951 F3d at 330, citing *Rowley*, 458 US at 207. Rather, all that's required is for the school district to confer meaningful educational benefits. *Michael F.*, 118 F3d at 248.

Properly viewed in temporal scope, this factor weighs in favor of Lamar CISD. It's undisputed that J.T. achieved many of the goals set by his IEP. Indeed, the hearing officer expressly found, "The evidence showed Student received more than a *de minimis* educational benefit from the homebound program provided." AR 40. With respect to behavioral goals, J.T. mastered *Behavioral Goal 1* and *Behavioral Goal 2*. AR 2458. With respect to academics, J.T. exceeded mastery of *English Goal 1* and mastered *Math Goal 1*, *Science Goal 1*, and *Social Studies Goal 1*. See AR 2445–50, 2452–53, 2455–56; see also AR 3555–56 (explaining mastery). And the hearing officer specifically noted, "Student did exceptionally well on the Biology STAAR, passed the Algebra I STAAR, and was only a few questions away from passing the English/Language Arts STAAR. It is clear Student was successful academically." AR 40.

J.T.'s progress was of course limited during the end of the Fall 2018 semester, and the evidence likewise shows that his behavioral progress regressed in part. But those events don't invalidate the progress noted in the above objective measures over the entire academic year. And when that year is viewed as a whole, it's clear that J.T. received meaningful academic and non-academic benefits.

    c. Balance of the factors

As noted above, the first and second factors aren't generally at issue here because J.T. only challenges the implementation of his IEP. *O.W.*, 961 F3d at 796. To the extent they do pertain, they weigh in favor of Lamar CISD, as they tend to show that J.T.'s IEP was individualized and

13

administered in the least restrictive environment. See AR 28–32.

The third factor doesn't strongly favor either party. Lamar CISD on the one hand did fail to implement the IEP in its monitoring of Thurston. But on the other hand, it made thorough and ultimately successful efforts to remediate those failures.

The fourth (and most critical) factor weighs decidedly in favor of Lamar CISD. See *P.P.*, 839 F App'x at 854. Quite simply, J.T. received meaningful academic and non-academic benefits during the applicable period of his IEP.

The ultimate question is whether Lamar CISD designed and implemented an appropriate IEP. By these standards and on this record, Lamar CISD didn't violate the IDEA. The subject IEP was specifically designed to help J.T. make meaningful progress in his academic and behavior skills. And he *did* make meaningful progress in both respects over the 2018–2019 academic year. The conduct related to Thurston is no doubt serious. And left to later consideration is whether J.T. is entitled to legal relief on his claims asserted under the Americans with Disabilities Act, the Rehabilitation Act, and the equal protection of laws guaranteed by the Fourteenth Amendment. But as to the federal statute at issue here, with Lamar CISD's design and implementation of his IEP, J.T. received that meaningful floor set for the public education of disabled children by the IDEA.

Partial summary judgment will enter in favor of Lamar CISD. It argued in the alternative that, even if the record shows that it failed to implement J.T.'s IEP, the compensation ordered by the hearing officer cannot stand because there's no evidence of an educational injury that needs to be remedied. See Dkt 20 at 32–40. Such contention is now moot because a "compensatory award requires a 'corresponding finding of an IDEA violation.'" *P.P.*, 839 F App'x at 857, quoting *O.W.*, 961 F3d at 800.

4. Conclusion

The motion for partial summary judgment by Plaintiff Lamar Consolidated Independent School District on its challenge to the decision of the Texas Education Agency hearing officer is GRANTED. Dkt 20.

The award of relief by the hearing officer is REVERSED AND VACATED as being contrary to the facts and law.

It is instead expressly DETERMINED that the remedial efforts by Lamar CISD were in compliance with the Individuals with Disabilities in Education Act and ensured that J.T. received a free, appropriate public education. As such, J.T. isn't a prevailing party entitled to an award of attorney fees.

SO ORDERED.

Signed on December 31, 2021, at Houston, Texas.

*[signature]*
Hon. Charles Eskridge
United States District Judge